**No. 24-3296**

# In the United States Court of Appeals for the Seventh Circuit

FRANK WILLIAM BONAN, II, individually and as an institution-affiliated party of GRAND RIVERS COMMUNITY BANK, GRAND CHAIN, ILLINOIS (INSURED STATE NONMEMBER BANK),

*Petitioner,*

**— v. —**

FEDERAL DEPOSIT INSURANCE CORPORATION,

*Respondent.*

On Petition for Review of the Decision and
Orders of the Federal Deposit Insurance Corporation,
Nos. FDIC-16-0254e and FDIC-16-0256k

**ANSWERING BRIEF OF RESPONDENT FEDERAL DEPOSIT INSURANCE CORPORATION**

J. SCOTT WATSON
Senior Counsel
JOSEPH BROOKS
Counsel
FEDERAL DEPOSIT INSURANCE CORPORATION
3501 Fairfax Drive
Arlington, VA 22226
Tel: (703) 562-2054
Fax: (703) 562-2469

*Counsel for Respondent Federal Deposit Insurance Corporation*

April 24, 2025

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Neither the Federal Deposit Insurance Corporation ("the FDIC") nor any attorney representing the FDIC in this case is required to provide a Disclosure Statement under Federal Rule of Appellate Procedure 26.1 or Circuit Rule 26.1 because the FDIC is a federal agency established under 12 U.S.C. § 1811 and no private attorney has appeared for the FDIC in this case, either before this Court or during the agency proceedings.

## TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT.....i

TABLE OF CONTENTS.....ii

TABLE OF AUTHORITIES.....v

PRELIMINARY STATEMENT.....1

JURISDICTIONAL STATEMENT.....4

COUNTERSTATEMENT OF THE ISSUES.....5

STATEMENT OF THE CASE.....6

I. Statutory, Regulatory, And Procedural Background.....6

A. The FDIC.....6

B. FDIC Administrative Enforcement Actions And Judicial Review.....7

C. The FDIC's Administrative Action Against Bonan.....9

II. Facts Relevant To The Issues Submitted For Review.....10

A. Bonan Exerted A "Dominant Influence" As Chairman of the Bank.....10

B. Evergreen Experienced Financial Difficulties And Bonan Devised A Plan To Pay Off Loans By Selling Assets Evergreen Had Pledged As Collateral.....12

C. Bonan Facilitated A $1.25 Million Loan From Grand Rivers To Two Of His Employees To Finance Their Purchase Of The Carmi Warehouse.....14

D. The $1.25 Million Loan To Finance The Purchase Of The Carmi Warehouse By Bonan's Employees Was Approved By The Grand Rivers Board Due To Bonan's "Dominant Influence".....16

E. The Carmi Warehouse Purchase And Sale And Lease Agreements Were Finalized With No Input From Harbison Or Tate.....17

F. FDIC Examiners Classified The $1.25 Million Loan As Substandard During Their 2016 Examination Of The Bank............18

G. Harbison And Tate's Company Defaulted On The $1.25 Million Loan And Grand Rivers Suffered A Loss Of More Than $500,000...........................................................................20

H. Bonan Contributed To The Negligent Release Of The Rig 23 PMSI...............................................................................20

III. Rulings Presented For Review...........................................................22

SUMMARY OF ARGUMENT...............................................................23

ARGUMENT.........................................................................................25

I. Under The Supreme Court's *SEC v. Jarkesy* Decision And The On-Point Decisions Of Three Circuits, Bonan Has No Right To A Jury Trial Here...........................................................................25

A. *Jarkesy* Relied Solely On Pre-existing Case Law And Did Not Overrule Any Prior Decision................................................25

B. This Case Is Distinguishable From *Jarkesy* In Several Respects.......31

1. The Section 1818 Enforcement Claims At Issue Are Matters That Fall Within "Distinctive Areas Involving Governmental Prerogatives"..............................................................31

a. Section 1818 Enforcement Actions Help Safeguard Public Funds...........................................................31

b. FDIC Deposit Insurance Is A Government Benefit................33

2. Section 1818 Claims Seeking CMPs Historically Have Been Adjudicated Exclusively By Administrative Tribunals................36

3. Section 1818 Enforcement Actions Do *Not* Regulate Transactions Between Private Individuals Interacting In A Pre-Existing Market..............................................................37

4. Section 1818 Enforcement Actions Are "Closely Intertwined" With The Federal Bank-Regulatory Regime.............................38

5. Prohibiting The FDIC And Other Federal Banking Agencies From Bringing Section 1818 Claims Seeking CMPs In Administrative Proceedings Would Prevent Them From Bringing Such Claims At All....39

C. All Three Circuit Courts That Have Decided The Issue Have Held That Section 1818 Claims Fall Within The Public-Rights Doctrine....40

II. Bonan Is Not Entitled To Relief On His Improper-Removal-Restriction Claims Because He Does Not Allege Any Compensable Harm....45

III. The FDIC Proceedings Did Not Violate Bonan's Right To Due Process....47

A. Administrative Agencies May Investigate And Adjudicate....47

B. There Is No Right To Take Pretrial Depositions In Administrative Proceedings....49

C. Bonan Has Waived The Argument That He Was Not Properly Served With The Notice And, In Any Event, He Was Properly Served....50

IV. The Record Overwhelmingly Supports The FDIC Board's Issuance Of A Prohibition Order And Assessment Of A $105,000 CMP....51

A. The FDIC Board Properly Issued The Prohibition Order....52

B. The FDIC Board Properly Assessed The $105,000 CMP....56

CONCLUSION....57

RULE 32(g) CERTIFICATE OF COMPLIANCE....59

CERTIFICATE OF SERVICE....60

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Akin v. OTS*,
950 F.2d 1180 (5th Cir. 1992)....................2, 40, 41, 42, 44

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*,
430 U.S. 442 (1977)....................37, 40

*AT&T, Inc. v. FCC*,
--- F.4th ---, 2025 WL 1135280 (5th Cir. Apr. 17, 2025)....................42, 43

*Bonnstetter v. City of Chicago*,
811 F.3d 969 (7th Cir. 2016)....................50, 51

*Calcutt v. FDIC*,
598 U.S. 623 (2023)....................52

*Calcutt v. FDIC*,
37 F.4th 293 (6th Cir. 2022), *rev'd on other grounds per curiam*,
598 U.S. 623 (2023)....................46

*Cavallari v. OCC*,
57 F.3d 137 (2d Cir. 1995)....................2, 43, 44

*CFPB v. Law Offices of Crystal Maroney, P.C.*,
63 F.4th 174 (2d Cir. 2023)....................46

*CFPB v. National Collegiate Master Student Loan Trust*,
96 F.4th 599 (3d Cir. 2024)....................46

*Collins v. Yellen*,
594 U.S. 220 (2021)....................2, 3, 24, 45, 46

*Community Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022), *rev'd on other grounds*, 601 U.S. 416 (2024)..........46

*Fahey v. Mallonee*,
332 U.S. 245 (1947)....................31

*FDIC v. First Horizon Asset Securities, Inc.*,
821 F.3d 372 (2d Cir. 2016)....................44

*Foreman v. Wadsworth*,
844 F.3d 620 (7th Cir. 2016)....................47

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989)....................26, 29, 30, 37-44

*Groos Nat'l Bank v. Comptroller of the Currency*,
573 F.2d 889 (5th Cir. 1978)....................39

*Hess v. Board of Trustees of Southern Illinois Univ.*,
839 F.3d 668 (7th Cir. 2016)....................24, 49

*Horne v. Department of Agric.*,
576 U.S. 350 (2015)....................35

*Hutto v. Davis*,
454 U.S. 370 (1982)....................48

*In re Murchison*,
349 U.S. 133 (1955)....................48

*In re Oliver*,
333 U.S. 257 (1948)....................49

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022), *aff'd*, 603 U.S. 109 (2024)....................40

*K & R Contractors v. Keene*,
86 F.4th 135 (4th Cir. 2023)....................46

*Kaufmann v. Kijakazi*,
32 F.4th 843 (9th Cir. 2022)....................46

*Kelly v. EPA*,
203 F.3d 519 (7th Cir. 2000)....................24, 49

*Leachco, Inc. v. CPSC*,
103 F.4th 748 (10th Cir. 2024)....................46

*Michael v. FDIC*,
687 F.3d 337 (7th Cir. 2012)....................24, 52, 53, 57

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) (en banc)....................44

*Nabozny v. Optio Solutions LLC*,
84 F.4th 731 (7th Cir. 2023)....................44

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982)....................37

*Rodriguez v. SSA*,
118 F.4th 1302 (11th Cir. 2024)....................46

*SEC v. Jarkesy*,
603 U.S. 109 (2024)....................2, 23-32, 36-45

*Sere v. Board of Trustees of the Univ. of Illinois*,
852 F.2d 285 (7th Cir. 1988)....................24, 50, 51

*Silverman v. CFTC*,
549 F.2d 28 (7th Cir. 1977)....................49

*Simpson v. OTS*,
29 F.3d 1418 (9th Cir. 1994)....................2, 32, 44

*Slattery v. United States*,
635 F.3d 1298 (Fed. Cir. 2011) (en banc)....................32

*Spawn v. Western Bank—Westheimer*,
989 F.2d 830 (5th Cir. 1993)....................32, 39

*Stern v. Marshall*,
564 U.S. 462 (2011)....................37

*Sunshine State Bank v. FDIC*,
783 F.2d 1580 (11th Cir. 1986)....................7

*Texas v. United States*,
126 F.4th 392 (5th Cir. 2025)....................41, 42

*Thomas v. Union Carbide Agric. Prods. Co.*,
473 U.S. 568 (1985)....................34, 35

*Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*,
460 U.S. 533 (1983)....................47, 48

*Tull v. United States*,
481 U.S. 412 (1987)....................26

*United States v. Cortez*,
930 F.3d 350 (4th Cir. 2019)....................4

*Williams v. Pennsylvania*,
579 U.S. 1 (2016)....................48, 49

*Withrow v. Larkin*,
421 U.S. 35 (1975)....................24, 47, 48, 49

*Zucker v. Rodriguez*,
919 F.3d 649 (1st Cir. 2019)....................32

## UNITED STATES CONSTITUTION

U.S. Const. amend. V....................47

U.S. Const. amend. VII....................2, 26, 27, 30, 44

U.S. Const. art. I....................35

U.S. Const. art. III....................2, 5, 23, 25, 30-39, 43-45

## FEDERAL STATUTES

5 U.S.C. §§ 551-559....................8

12 U.S.C. § 1813(q)....................4

12 U.S.C. § 1813(u)....................4

12 U.S.C. § 1817....................32

12 U.S.C. § 1818....................2, 7, 23, 25, 31, 32, 35-39, 43-45

12 U.S.C. § 1818(b)....................7

12 U.S.C. § 1818(b)(1)....................7

12 U.S.C. § 1818(c)....................7

12 U.S.C. § 1818(e)....................4, 7, 9

12 U.S.C. § 1818(h)....................5, 7, 35

12 U.S.C. § 1818(h)(1)....4, 36

12 U.S.C. § 1818(h)(2)....8

12 U.S.C. § 1818(i)....4, 7, 9, 43

12 U.S.C. § 1818(i)(2)(A)....35

12 U.S.C. § 1818(i)(2)(B)....35

12 U.S.C. § 1818(i)(2)(C)....35

12 U.S.C. § 1818(i)(2)(H)....35

12 U.S.C. § 1819(a) (Eighth)....6

12 U.S.C. § 1820(b)....7

12 U.S.C. § 1820(b)(2)....6

12 U.S.C. § 1820(d)(1)....6

12 U.S.C. § 1821(a)(4)....32

12 U.S.C. § 1824....32

15 U.S.C. § 77h-1(g)....36

15 U.S.C. § 78u-2(a)....36

15 U.S.C. § 80b-3(i)(1)....36

Administrative Procedure Act,
Pub. L. 79-404, 60 Stat. 237....8

Banking Act of 1933,
Pub. L. 73-66, 48 Stat. 162....6

Federal Deposit Insurance Act of 1950,
Pub. L. 81-797, 64 Stat. 873....4, 6

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
Pub. L. 101-73, 103 Stat. 183....6

Financial Institutions Supervisory Act of 1966,
Pub. L. 89-695, 80 Stat. 1028 .......... 6

**FEDERAL REGULATIONS**

12 C.F.R. Part 308 .......... 8

12 C.F.R. § 308.5 .......... 8

12 C.F.R. § 308.11(c)(2) .......... 50, 51

12 C.F.R. § 308.11(c)(2)(v) .......... 50

12 C.F.R. § 308.38 .......... 8

12 C.F.R. § 308.39 .......... 8

12 C.F.R. § 308.40 .......... 8

**FEDERAL RULES**

Fed. R. App. P. 15(a) .......... 5

**SEVENTH CIRCUIT RULES**

Circuit Rule 28(b) .......... 4

## PRELIMINARY STATEMENT

Petitioner Frank William Bonan, II ("Bonan") was the Chairman of the Board of Grand Rivers Community Bank ("Grand Rivers" or "the Bank") and a member of the Bank's committee that approved loans. But he was much more than that. Bonan was Grand Rivers' primary policy and decision maker, and he exerted a "dominant influence" over the Bank.[1] Grand Rivers' former CFO testified that "everybody in the Bank took orders from Mr. Bonan."[2] Its former CEO testified that Bonan led "by intimidation."[3] Its former president testified that Bonan always "tr[ied] to push [him] around" to "make [him] do what he wanted done."[4] And Grand Rivers' former general counsel testified that Bonan "rul[ed] with an iron fist" and "[p]eople lost their jobs if they didn't follow his explicit directions."[5]

Against this backdrop, Bonan facilitated a $1.25 million loan from Grand Rivers as part of his plan to bail out a financially distressed client. To implement his plan, Bonan enlisted two of his employees to obtain the loan, use the proceeds to purchase the client's warehouse, and lease the warehouse back to the client. But as Bonan well knew, his handpicked borrowers were not creditworthy for a loan of that size. Indeed, their combined adjusted gross incomes were less than the annual amount of the loan's monthly payments. Unsurprisingly, the borrowers defaulted. As a result, the Bank lost more than $500,000. This enforcement action followed.

---

[1] Rule 30(a) Appendix ("30(a)App.") 4.

[2] Rule 30(b) Appendix ("30(b)App.") 15.

[3] 30(a)App. 4.

[4] *Id.*

[5] *Id.*

At the conclusion of the administrative proceedings, the FDIC Board issued an order prohibiting Bonan from participating in banking and assessed a $105,000 civil money penalty ("CMP") against him. Bonan responded with this appeal, in which he makes a barrage of constitutional and abuse-of-discretion arguments in an effort to vacate the FDIC Board's Decision and Orders. All of Bonan's arguments lack merit. Accordingly, his petition for review should be denied.

*First*, Bonan invokes the Seventh Amendment and argues he was denied his right to a jury trial. But he all but ignores the public-rights doctrine, under which certain claims may be adjudicated by a non-Article III tribunal without a jury. Bonan relies on the Supreme Court's decision in *SEC v. Jarkesy*,[6] which addressed administrative adjudication of securities-fraud claims. However, banking is different—and federally insured banking is very different. Indeed, all three federal circuit courts that have decided the question have held that adjudication of claims under the statute at issue here—12 U.S.C. § 1818—is an enforcement of public rights and, therefore, no jury trial is required.[7] As we show *infra*, these decisions are entirely consistent with *Jarkesy*. Thus—under both *Jarkesy* and the directly-on-point decisions of three sister circuits—Bonan has no right to a jury trial here.

*Second*, Bonan argues that FDIC Board members and administrative law judges ("ALJs") have improper removal restrictions and that the Board's orders must therefore be vacated. But in *Collins v. Yellen*, the Supreme Court held that a

[6] 603 U.S. 109 (2024).

[7] *See Cavallari v. OCC*, 57 F.3d 137, 145 (2d Cir. 1995); *Simpson v. OTS*, 29 F.3d 1418, 1423-24 (9th Cir. 1994); *Akin v. OTS*, 950 F.2d 1180, 1186 (5th Cir. 1992).

litigant challenging a removal restriction must show the restriction "inflict[ed] compensable harm."[8] As the Court explained, this may be done by, for example, pointing to a "public statement" by the President "expressing displeasure with actions taken by a Director and [asserting] that he would remove the Director if the statute did not stand in the way."[9] Bonan does not contend that anything like that happened here. Thus, he is not entitled to relief on his removal-restriction claims.

*Third*, Bonan argues that he was denied due process of law because: (1) the FDIC acted as both prosecutor and adjudicator; (2) he was denied the opportunity to take pretrial depositions; and (3) he was not adequately served with the Notice of Charges. But as we demonstrate *infra*, each of these arguments directly conflicts with controlling Supreme Court or Seventh Circuit precedent.

*Fourth*, Bonan argues that the FDIC Board abused its discretion in concluding that his facilitation of the $1.25 million loan warranted imposition of a prohibition order. But as we show *infra*, the FDIC Board correctly concluded "the record in this matter overwhelmingly establishes that [Bonan] jeopardized the safety and soundness of Grand Rivers with regards to the [$1.25 million] loan by facilitating a sizable loan through two borrowers he knew or should have known were not creditworthy, at a significant and foreseeable risk of loss to Grand Rivers."[10]

*Fifth*, contrary to Bonan's argument—and as we demonstrate *infra*—the record also includes ample support for the FDIC Board's assessment of the $105,000 CMP.

---

[8] 594 U.S. 220, 259 (2021).

[9] *Id.* at 260.

[10] 30(a)App. 28.

## JURISDICTIONAL STATEMENT

The FDIC disagrees with Bonan's Jurisdictional Statement insofar as he contends the FDIC Board and the ALJ lacked subject-matter jurisdiction.[11] Accordingly—as required by Circuit Rule 28(b)—the FDIC provides this complete jurisdictional summary.

1. "When it comes to administrative agencies, the question of subject-matter jurisdiction is more appropriately framed as whether the agency actor, such as the [FDIC Board or ALJ] here, lacked statutory authority to act or acted outside its authority to adjudicate."[12] At all relevant times, Grand Rivers was a state-chartered bank and an insured non-member bank subject to the FDI Act, 12 U.S.C. §§ 1811-1831aa.[13] When the transactions at issue occurred, Bonan was the Chairman and a director of Grand Rivers.[14] As such, he was an "institution-affiliated party" of Grand Rivers as that term is defined in 12 U.S.C. § 1813(u).[15] The FDIC therefore had the statutory authority to issue a prohibition order and impose a CMP against Bonan. *See* 12 U.S.C. §§ 1813(q), 1818(e), and 1818(i). Accordingly, 12 U.S.C. § 1818(h)(1) authorized the ALJ to preside over the agency proceedings in this case and that same statutory provision authorized the FDIC Board to issue the final Decision and Orders at issue in this appeal.

---

[11] *See* Petitioner's Br. 3.

[12] *United States v. Cortez*, 930 F.3d 350, 358 (4th Cir. 2019) (internal quotation marks omitted).

[13] 30(a)App. 3.

[14] Petitioner's Br. 5-6.

[15] 30(a)App. 3.

2. This Court has jurisdiction under 12 U.S.C. § 1818(h) and Fed. R. App. P. 15(a) over this appeal from the FDIC Board's Decision and Orders because the Decision and Orders were issued on December 17, 2024,[16] and Bonan timely filed his petition for review fewer than thirty days later on December 20, 2024.[17]

## COUNTERSTATEMENT OF THE ISSUES

1. Did the FDIC Board correctly determine that the administrative enforcement claims at issue fall within the public-rights doctrine and, therefore, properly could be adjudicated by a non-Article III tribunal without a jury?

2. Did the FDIC Board correctly determine that Bonan's failure to show that the removal restrictions for FDIC Board members and ALJs he challenges inflicted compensable harm barred any relief based on those challenges?

3. Did the FDIC Board correctly determine that Bonan's claims that this administrative enforcement proceeding improperly combined prosecution and adjudication, that he was denied the opportunity to take discovery depositions, and that he was not properly served failed to establish any due-process violation?

4. Did the FDIC Board properly exercise its discretion in issuing a prohibition order and assessing a $105,000 CMP against Bonan based on his facilitation of a $1.25 million loan to borrowers he knew were not creditworthy for a loan of that size, which resulted in a $513,760 loss to Grand Rivers?

5. Did the FDIC Board properly exercise its discretion in determining that Bonan's negligent supervision of the Bank's employees and failure to clarify a known

---

[16] *See id.* at 88, 89.

[17] *See* Document: 1-1.

discrepancy—which contributed to the erroneous release of collateral that caused the Bank to lose an additional $489,268—further supported the $105,000 CMP?

## STATEMENT OF THE CASE

### I. Statutory, Regulatory, And Procedural Background.

#### A. The FDIC.

In response to an epidemic of bank closures, in 1933 Congress established the FDIC to restore confidence in the nation's financial institutions by, among other things, administering a system of deposit insurance.[18] Subsequent legislation expanded the FDIC's role in regulating and stabilizing banks.[19] Thus, the FDIC acts as a deposit insurer, a regulator for certain state-chartered banks (including Grand Rivers), and a receiver for failed banks.

The FDI Act gives the FDIC broad regulatory authority to supervise state-chartered financial institutions that, like Grand Rivers, are not members of the Federal Reserve System. In particular, the FDIC is empowered "[t]o make examinations of and to require information and reports from [such FDIC-insured] depository institutions."[20] These examinations may occur "whenever the [FDIC's] Board of Directors determines an examination of any such depository institution is necessary," but not less than once a year for certain FDIC-insured banks like Grand Rivers.[21]

---

[18] *See* Banking Act of 1933, Pub. L. 73-66, 48 Stat. 162; Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. §§ 1811, 1819.

[19] *See, e.g.*, Federal Deposit Insurance Act of 1950, Pub. L. 81-797, 64 Stat. 873; Financial Institutions Supervisory Act of 1966, Pub. L. No. 89-695, 80 Stat. 1028; Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183.

[20] 12 U.S.C. § 1819(a) (Eighth).

[21] 12 U.S.C. §§ 1820(b)(2) and (d)(1).

Congress also directed the FDIC Board to appoint examiners who are empowered to conduct bank examinations.[22] "After extensive training, lengthy apprenticeship and careful evaluation, FDIC examiners are appointed as 'commissioned examiners', and thereby vested with authority to make informed predictions about the risk inherent in a bank's assets."[23]

**B. FDIC Administrative Enforcement Actions and Judicial Review.**

The FDIC is also empowered by statute to initiate administrative enforcement actions against FDIC-insured financial institutions and affiliated parties who engage in unsafe and unsound practices or violate banking laws or regulations.[24] When exercising this authority, the FDIC may issue a notice of charges,[25] hold hearings,[26] issue cease-and-desist orders,[27] and, when appropriate, impose sanctions—including removing institution-affiliated parties from their bank-related offices, prohibiting them from working in the banking industry, and assessing CMPs against them.[28]

The FDIC initiates an administrative enforcement action by serving a notice of charges on a respondent. Unless the charges are uncontested, a hearing and related proceedings are subsequently conducted by an ALJ under the Administrative

[22] 12 U.S.C. § 1820(b).

[23] *Sunshine State Bank v. FDIC*, 783 F.2d 1580, 1583 (11th Cir. 1986).

[24] *See* 12 U.S.C. § 1818.

[25] *Id.* at § 1818(b)(1).

[26] *Id.* at § 1818(h).

[27] *Id.* at §§ 1818(b) and (c).

[28] *Id.* at §§ 1818(e) and (i).

Procedure Act ("APA")[29] and the FDIC's corresponding Rules of Practice and Procedure.[30] FDIC ALJs are authorized to conduct a broad range of activities, including handling scheduling matters, issuing subpoenas, overseeing discovery, ruling on certain procedural matters, and ruling on the admissibility of evidence.[31]

After completion of a hearing and filing of post-hearing submissions, the ALJ must issue a recommended decision and file with the FDIC's Executive Secretary the complete administrative record of the proceeding, including recommended findings of fact and conclusions of law and a proposed order.[32] The parties may then file "exceptions" to the ALJ's recommended decision.[33] Thereafter, the case is transmitted to the FDIC Board for its review and, within 90 days, issuance of a final decision and order.[34]

Once the FDIC Board issues its final decision and order, the respondent may, within 30 days, appeal to the United States Court of Appeals for either the District of Columbia Circuit or the circuit within which the bank's home office is located.[35] The court of appeals conducts its review of the FDIC Board's final decision and order under the APA.[36]

[29] 5 U.S.C. §§ 551-559.

[30] 12 C.F.R. Part 308.

[31] *See id.* at § 308.5.

[32] *Id.* at § 308.38.

[33] *Id.* at § 308.39.

[34] *Id.* at § 308.40.

[35] *See* 12 U.S.C. § 1818(h)(2).

[36] *Id.*

**C. The FDIC's Administrative Enforcement Action Against Bonan.**

In May 2021, the FDIC commenced this administrative enforcement action against Bonan by filing a Notice of Charges ("Notice") seeking an order of prohibition and imposition of a $105,000 CMP under 12 U.S.C. §§ 1818(e) and (i).[37] The Notice alleged that Bonan engaged in unsafe or unsound banking practices and breached his fiduciary duties to Grand Rivers in connection with the Bank's loan relationship with Evergreen Drilling, Evergreen Properties, and related borrowers (collectively the "Evergreen Entities" or "Evergreen").[38] Bonan timely answered the Notice on May 26, 2021, and asserted affirmative defenses.[39]

In January 2023, the ALJ held a six-day hearing.[40] More than fifteen witnesses testified, including Bonan.[41] The parties also introduced a total of 310 exhibits, which were admitted into evidence in connection with witness testimony.[42]

In November 2023, the ALJ issued a Recommended Decision.[43] The ALJ concluded "the statutory elements for a prohibition order under 12 U.S.C. § 1818(e) [were] met" with respect to both the $1.25 million loan and a negligent release of collateral known as "Rig 23."[44] The ALJ also "conclude[d] that [s]ection 1818(i)'s elements for a second-tier [CMP] [were] met as to both the [$1.25 million] loan and

[37] 30(a)App. 2.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] 30(b)App. 139-140.

the Rig 23 release, that no mitigation [was] warranted, and that $105,000 is an appropriate monetary penalty for [Bonan's] misconduct in this case."[45]

In April 2024, Bonan filed exceptions to the ALJ's Recommended Decision.[46]

On December 17, 2024, the FDIC Board issued its Decision and Orders.[47] The Board agreed with the ALJ's conclusion that a prohibition order was warranted by Bonan's misconduct related to the $1.25 million loan,[48] but it disagreed with the ALJ's conclusion that a prohibition order was also warranted by Bonan's misconduct related to the Rig 23 release.[49] In addition, the FDIC Board agreed with the ALJ's conclusion that a $105,000 CMP was warranted by both Bonan's misconduct related to the $1.25 million loan and his misconduct related to the Rig 23 release.[50]

## II. Facts Relevant To The Issues Submitted For Review.

### A. Bonan Exerted a "Dominant Influence" as Chairman of the Bank.

At all times relevant to this appeal, Bonan was the Chairman and a director of Grand Rivers, and he was also a member of the Bank's committee that approved loans.[51] Bonan began his banking career at Peoples National Bank, N.A., McLeansboro, Illinois ("PNB"), where he worked under his father, who was at that time the

---

[45] *Id.* at 140.

[46] 30(a)App. 2.

[47] *Id.* at 88, 89.

[48] *Id.* at 27.

[49] *Id.* at 54-57.

[50] *Id.* at 42, 43-44.

[51] Petitioner's Br. 5-6; 30(a)App. 3.

president of PNB.[52] Bonan ultimately became PNB's community bank president for the southern region and served on its Board of Directors and Executive Loan Committee.[53] Even after subsequently purchasing stock in and becoming the Chairman of Grand Rivers—and throughout the time the events relevant to this appeal occurred—Bonan continued in his leadership positions at PNB.[54]

At Grand Rivers, Bonan exerted a "dominant influence" and was the primary policy and decision maker.[55] The Bank's former CFO testified that "basically everybody in the Bank took orders from Mr. Bonan."[56] The former general counsel testified that Bonan "rule[d] with an iron fist. It was his way or no way. There was no discussing issues with him. He gave direction. You had to follow him."[57] The former CEO testified that Bonan led "by intimidation rather than respect."[58] And the Bank's former president testified that Bonan "was always trying to push [him] around to 'make [him] do what he wanted done.'"[59]

As particularly relevant here, Bonan managed and directed the Evergreen loan relationship at Grand Rivers and, along with a PNB loan officer, he also managed the Evergreen loan relationship at PNB.[60]

---

[52] 30(b)App. 14.

[53] *Id.*

[54] *Id.*

[55] 30(a)App. 4.

[56] 30(b)App. 15.

[57] *Id.* at 16.

[58] 30(a)App. 4

[59] *Id.*

[60] *Id.* at 4, 6.

### B. Evergreen Experienced Financial Difficulties and Bonan Devised a Plan to Pay Off Loans by Selling Assets Evergreen had Pledged as Collateral.

Evergreen Drilling was an oil-drilling company based in Carmi, Illinois.[61] As of September 2015, Evergreen Drilling and Evergreen Properties had outstanding loans with Grand Rivers of approximately $1.2 million, and the Evergreen Entities collectively owed PNB approximately $10.5 million.[62] During 2015, Evergreen Drilling experienced severe financial difficulties due to an industry-wide downturn.[63]

At Evergreen's request, PNB agreed to accept interest-only payments on some loans for six months and extended an increased line of credit to Evergreen.[64] When those measures failed to improve Evergreen's financial condition, Bonan and others at PNB expressed concern about Evergreen's ability to service its debt, and they began considering how PNB might exercise the company's options regarding the sale of its assets and a potential future increase in cash flow.[65]

In September 2015, Bonan prepared a handwritten document entitled "Plan for Evergreen" in which he proposed that the Evergreen entities sell assets that had been pledged as collateral and refinance their loans in order to repay approximately $5.4 million of the debt they owed PNB and Grand Rivers.[66] One of the pieces of collateral included in Bonan's plan was a commercial warehouse in Carmi, Illinois,

---

[61] *Id.* at 5.

[62] *Id.* at 5-6.

[63] *Id.* at 6.

[64] *Id.*

[65] *Id.*

[66] *Id.*

that Evergreen used as its headquarters.[67] At that time, there were two mortgage liens on the Carmi Warehouse securing a $358,000 first mortgage held by PNB and a $638,000 second mortgage held by Grand Rivers.[68]

Bonan thought it was "critical" that Evergreen Drilling be able to continue to use the Carmi Warehouse as its headquarters because he believed an oil and gas company could not function well without a suitably large yard and a corporate office.[69] Accordingly, he envisioned a sale and leaseback transaction in which someone would purchase the warehouse from Evergreen and it could then pay down its loans while continuing to use the warehouse under a lease.[70]

Bonan's original plan was to purchase and lease back the Carmi Warehouse himself.[71] In December 2015, Bonan and Carrollton Bank finalized terms of an agreement under which that bank would finance Bonan's purchase of the warehouse.[72] Shortly thereafter, however, Bonan backed out of the Carrollton Bank deal.[73] Although he subsequently provided conflicting reasons for doing this, the ALJ found the evidence supported the conclusion that Bonan backed out because he came up with a "way to get Evergreen the funds it needed and reduce its debt to PNB . . . [that] requir[ed] less financial outlay on his own part and . . . no personal

---

[67] *Id.*

[68] *Id.* at 6-7.

[69] *Id.* at 7-8; 30(b)App. 26.

[70] 30(a)App. 8.

[71] *Id.*

[72] *Id.*; 30(b)App. 29-31.

[73] *Id.* at 31.

risk to him."[74] Instead, Bonan devised an alternate plan that shifted the risk of his proposed sale-and-leaseback transaction to Grand Rivers.

### C. Bonan Facilitated a $1.25 Million Loan from Grand Rivers to Two of His Employees to Finance Their Purchase of the Carmi Warehouse.

While he was still negotiating with Carrollton Bank, Bonan approached two individuals—James Harbison and Adam Tate—and asked them to purchase the Carmi Warehouse with financing from Grand Rivers.[75] Harbison testified that Bonan told them: "I need you to do me a favor, this deal would help me out a lot."[76] Harbison also testified that Bonan assured him there would be no problem getting financing for the transaction because of Bonan's position at Grand Rivers.[77]

At the time Bonan asked Harbison and Tate to purchase the Carmi Warehouse, they both worked for him and lived rent free in housing he owned.[78] Harbison provided property management services, such as lawn mowing and landscaping, to a company Bonan owned and Tate was a contract employee.[79] Neither of them had significant financial assets: Harbison had a negative net worth of $190,000 and an adjusted gross income of $62,000, and Tate had a net worth of $20,000 and an adjusted gross income of $27,000.[80] When asked while testifying whether he believed

[74] *Id.* at 33.

[75] 30(a)App. 8.

[76] *Id.*

[77] 30(b)App. 34-35; *see also id.* at 35 n.149 (Harbison recalled during an FDIC Office of Inspector General interview that Bonan had told him and Tate "the Bank would not 'screw [them] over' on the loan because [Bonan] was 'in charge of the Bank'").

[78] 30(a)App. 8.

[79] *Id.* at 8-9.

[80] 30(b)App. 34.

he was creditworthy to qualify for a $1.25 million loan, Harbison responded: "Absolutely not."[81]

Harbison also explained why he nevertheless agreed to do what Bonan had requested: "I thought there was no way that it would get approved and that would keep me from having to anger [Bonan] or disappoint him and tell him no[.]"[82] And as Harbison further testified, he believed that if he had refused Bonan's request, Bonan would have "fired [him], told [him he] needed to move out, . . . there would have been a consequence."[83]

In December 2015, Bonan directed Grand Rivers' CFO to prepare a loan request on behalf of Harbison and Tate to purchase the Carmi Warehouse from Evergreen Properties for $1.25 million.[84] The loan was to be made in the name of 618 Holdings, LLC—the company they would form to implement the transaction.[85] The terms of purchase and the lease agreement for the purchase and leaseback of the Carmi Warehouse were nearly identical to the terms of the proposed purchase of the warehouse by Bonan—terms that Bonan had negotiated.[86] And Grand Rivers' CFO testified that he structured the loan payment reserve for the transaction based on instructions he received from Bonan.[87] The loan's terms required the

[81] *Id.* Tate was not called as a witness by either side. *Id.* at 34 n.145.

[82] *Id.* at 35.

[83] *Id.*

[84] 30(a)App. 9.

[85] *Id.*; 30(b)App. 36.

[86] 30(a)App. 9.

[87] *Id.*

borrowers to make monthly payments in the amount of $7,752.94—which totaled $93,035.28 annually.[88] This was more than Harbison and Tate's combined adjusted gross incomes, which totaled $89,000 annually.[89]

Harbison testified that—other than choosing the name of the company they formed and visiting the Carmi Warehouse once before the sale—he and Tate had no involvement with the transaction or knowledge of the transaction's terms until the day of closing.[90] Rather, everything was done for them by Grand Rivers' employees at the direction of Bonan.[91]

### D. The $1.25 Million Loan to Finance the Purchase of the Carmi Warehouse by Bonan's Employees was Approved by the Grand Rivers Board due to Bonan's "Dominant Influence."

On December 23, 2015, the Board of Directors for Grand Rivers voted to approve the $1.25 million loan to Harbison and Tate's newly-formed company.[92] Bonan initially voted to approve the loan, but subsequently informed Kassie Winters, the Bank's Head of Loan Operations, that he would abstain because Harbison and Tate were his employees.[93] But notwithstanding his abstention, Bonan had a "dominant influence" on the ultimate vote because, as Winters testified, "[Bonan] was the one helping to push through this loan."[94]

---

[88] *Id.* at 41.

[89] *Id.*

[90] *Id.* at 10.

[91] *Id.*

[92] *Id.*

[93] *Id.*; 30(b)App. 42.

[94] *Id.* at 42 n.190.

The votes of three of the five Grand Rivers board members were needed to approve the loan.[95] Of the remaining four board members, CFO Gaskins, Lucas Phelps, and Jake Campbell voted yes and CEO Stringer abstained.[96] Gaskins testified that, although he did not believe Harbison and Tate had the ability to repay the loan, he voted to approve it because he was told to do so by Bonan and he believed that, if he hadn't voted to approve, Bonan would have removed him from his position.[97] Campbell testified that, if he had known Evergreen Drilling's loan from PNB was at nonaccrual status and had been classified as substandard at the time of approval of the $1.25 million loan, he instead would have voted no.[98] And Stringer testified that she abstained from voting because, although she had concerns about the borrowers and their ability to repay the loan, a no vote would have prompted Bonan to fire her.[99]

### E. The Carmi Warehouse Purchase and Sale and Lease Agreements Were Finalized with No Input from Harbison or Tate.

On January 7, 2016, 618 Holdings LLC and Evergreen Properties finalized the purchase and sale and lease agreements for the Carmi Warehouse.[100] The transaction terms and loan structure were formulated by Bonan, and Harbison and Tate had no knowledge of the terms until the day of closing.[101] The only change made at

---

[95] Petitioner's Br. 18.

[96] 30(a)App. 10; 30(b)App. 42.

[97] 30(a)App. 10-11; 30(b)App. 43.

[98] 30(a)App. 11; 30(b)App. 43-44.

[99] 30(a)App. 11; 30(b)App. 44.

[100] 30(a)App. 13.

[101] *Id.*

that time was the inclusion by Harbison of an escalation provision that steadily escalated Evergreen's lease payments after expiration of the initial eighteen-month period.[102]

From the loan proceeds, the first and second mortgage liens at PNB and Grand Rivers, respectively, were paid off.[103] Part of the proceeds also funded a $150,000 lease reserve that was placed in an escrow account to pay the first eighteen monthly lease payments Evergreen was required to make to 618 Holdings LLC.[104] And $100,000 was given to Evergreen Properties for operational expenses.[105]

### F. FDIC Examiners Classified the $1.25 Million Loan as Substandard During their 2016 Examination of the Bank.

In January 2016, during the examination process, FDIC examiners looked into the $1.25 million loan.[106] At a February 2016 meeting with the examiners, CFO Gaskins was asked about the lease reserve structure, and he reported that it was Bonan's idea to establish the lease reserves and that the source of repayment on the loan would be lease payments from Evergreen.[107] The examiners then classified the loan as substandard.[108] Their Report of Examination states that this was "due to the lack of financial capacity of the debtors, the inappropriate structuring of the 618 Holdings credit in which an indirect [principal and interest] reserve account

---

[102] *Id.*

[103] 30(b)App. 45.

[104] *Id.*

[105] *Id.*

[106] 30(a)App. 14.

[107] *Id.*

[108] *Id.*

was established to make loan payments, the lack of collateral protection, and the questionable ability of Evergreen Properties to generate sufficient income to pay lease payments."[109] The examiners also noted that the "[b]orrowers did not have a down payment and didn't bring anything to the table on this deal."[110]

Both the Board and the ALJ credited the joint fact and expert testimony of the bank examiners (and related reports) that the structure of the $1.25 million loan increased the risk to Grand Rivers.[111] Specifically, the examiners explained that the loan resulted in Grand Rivers taking on additional debt—moving debt previously held by PNB to Grand Rivers, and also another $250,000 in the lease-reserve escrow and operating expenses.[112] This additional debt, on the same collateral, reduced the Bank's ability to recoup those funds by "jeopardizing the Bank's ability to liquidate [the collateral] in case of default."[113] The examiners also testified that the loan file for the $1.25 million loan lacked a basic analysis of repayment capacity and did not conform to prudent loan workout practices, and that the lease reserve served to mask the loan's true repayment ability (or lack thereof).[114]

On April 7, 2016, the loan was put on non-accrual status and, two weeks later, Bonan, Gaskin, and Campbell resigned from their positions at Grand Rivers.[115]

---

[109] *Id.* (brackets in original); 30(b)App. 49-50 (same).

[110] *Id.* at 50 n.227.

[111] *Id.* at 50-51; 30(a)App. 14, 32.

[112] *Id.* at 14.

[113] *Id.* (bracket added); *see also* 30(b)App. 51 (same).

[114] 30(a)App. 14; *see also* 30(b)App. 51 and nn.234-236.

[115] 30(a)App. 15; 30(b)App. 52.

### G. Harbison and Tate's Company Defaulted on the $1.25 Million Loan and Grand Rivers Suffered a Loss of More Than $500,000.

In January 2017, Grand Rivers charged off $500,000 from the $1.25 million loan.[116] The borrowers then defaulted on the loan, which had a balance of $668,519 after the charge-off and after the Bank applied the remaining funds from the lease reserve account.[117] In April 2017, in order to avoid foreclosure, the borrowers entered into a deed-in-lieu of foreclosure with Grand Rivers.[118] In December 2018, the Bank wrote down the debt by an additional $13,760.[119]

As of November 2022, the best offer Grand Rivers had received on the Carmi Warehouse was $500,000—more than $150,000 less than the then-current amount of the debt.[120] The Bank rejected that offer because it would have required "further charge-downs which it couldn't afford at that time."[121] As of the date of the ALJ's Recommended Decision, Grand Rivers still owned the Carmi Warehouse as an Other Real Estate Owned property."[122]

### H. Bonan Contributed to the Negligent Release of the Rig 23 PMSI.

In January 2013, Grand Rivers had obtained a purchase money security interest ("PMSI") in Evergreen's self-propelled oil-drilling rig known as "Rig 23," which

---

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] 30(a)App. 15 n.1.

[120] *Id.* at 15.

[121] 30(b)App. 53; *see also* 30(a)App. 15.

[122] 30(b)App. 53; 30(a)App. 15.

secured a $490,000 loan to Evergreen Drilling.[123] That same month, the Bank filed with the Illinois and Indiana Secretaries of State UCC-1s expressly reflecting its Rig 23 PMSI.[124] PNB also held a security interest in Rig 23, but its interest was subject to Grand Rivers' $490,000 PMSI, which took priority over PNB's lien.[125] In May 2014, the Bank consolidated its existing loans to Evergreen with an additional loan, increasing the loan balance to $640,500.[126] As of the fall of 2015, the Bank's Rig 23 PMSI was the only collateral securing its Evergreen Drilling loan.[127]

As part of Bonan's plan for Evergreen to sell assets and pay down its loans from PNB and Grand Rivers, in October 2015 Evergreen Drilling sold a second oil-drilling rig it owned, which was known as "Rig 24."[128] Through a series of errors by three Grand Rivers officers—Bonan, Gaskins, and Winters—the Bank's PMSI for *Rig 23* was erroneously released in the mistaken belief that any security interest the Bank might have had in *Rig 24* was being released.[129] Though not solely responsible, Bonan contributed to this error by, among other actions, directing Gaskins and Winters to provide PNB with a release of a security interest in *Rig 24* even though he knew Grand Rivers had no security interest in *Rig 24*.[130]

---

[123] *Id.* at 16.

[124] *Id.*

[125] *Id.*

[126] *Id.* at 16-17; 30(b)App. 56.

[127] 30(a)App. 17.

[128] *Id.* at 17-18.

[129] *Id.* at 19-23.

[130] *Id.* at 21-23.

The erroneous release of Grand Rivers' Rig 23 PMSI meant that its consolidated loan to Evergreen Drilling was no longer secured by collateral.[131] The error was discovered during the examination of the Bank in early 2016.[132] In January 2017, Grand Rivers charged off the Evergreen Drilling loan in the amount of $489,268.[133]

**III. Rulings Presented For Review.**

The Petition challenges the FDIC Board's determinations that:

1. Bonan was not entitled to a jury trial;[134]
2. Bonan was not entitled to relief on his removal-restriction claims;[135]
3. Bonan failed to establish any due process violation based on his allegations that (i) the FDIC both investigated and adjudicated claims against him, (ii) he was denied the opportunity to take pretrial depositions, and (iii) the Notice was not adequately served on him;[136]
4. A prohibition order was appropriate based on Bonan's misconduct in connection with the $1.25 million loan to Harbison and Tate's company;[137] and
5. A $105,000 CMP was appropriate based on Bonan's misconduct in connection with both the $1.25 million loan and the release of the Rig 23 PMSI.[138]

---

[131] *Id.* at 23.

[132] *Id.*

[133] *Id.*

[134] *Id.* at 67-81.

[135] *Id.* at 81-83.

[136] *Id.* at 60-66.

[137] *Id.* at 27-42.

[138] *Id.* at 42-58.

## SUMMARY OF ARGUMENT

1. Bonan has no right to a jury trial in this section 1818 administrative enforcement action. In *SEC v. Jarkesy*, the Supreme Court held the public-rights doctrine did not apply to the adjudication of securities-fraud claims in an administrative enforcement action because that "action d[id] not fall within any of the distinctive areas involving governmental prerogatives where . . . a matter may be resolved outside of an Article III court, without a jury."[139] The Court thus held that Jarkesy was entitled to a jury trial in an Article III court. But here, this section 1818 enforcement action *does* fall within two distinctive areas involving governmental prerogatives: (1) safeguarding public funds in the Deposit Insurance Fund and the Treasury; and (2) granting the Government benefit of deposit insurance.

What is more, unlike the securities-fraud action in *Jarkesy* that the SEC could bring in either a federal court or an in-house proceeding at its choosing, the FDIC has never been authorized to bring enforcement claims seeking CMPs in federal court. Rather, it has historically been authorized to adjudicate such claims *exclusively* in administrative proceedings.

For these and other reasons discussed *infra*, *Jarkesy* is distinguishable and its rationale strongly supports the applicability of the public-rights doctrine here.

Moreover, all three federal courts of appeals that have decided the question have held that section 1818 enforcement actions fall within the public-rights doctrine. These decisions are entirely consistent with *Jarkesy* because they are

---

[139] *Jarkesy*, 603 U.S. at 120.

grounded on the same pre-existing Supreme Court case law. Thus, under both *Jarkesy* and decisions of three sister circuits, Bonan has no right to a jury trial here.

2. Bonan is not entitled to any relief on his removal-restriction claims. In *Collins v. Yellen*, the Supreme court held that a litigant must show a removal restriction "inflict[ed] compensable harm" in order to receive any relief.[140] Bonan cannot make such a showing here because he has not alleged any compensable harm.

3. Bonan has not alleged any due-process violation. *First*, both the Supreme Court and this Court have held that investigation and adjudication by an administrative body does not, without more, show a due-process violation.[141] *Second*, this Court has held there is no right to take pretrial depositions in administrative proceedings.[142] And *third*, Bonan waived his improper-service argument by failing to mention in his opening brief that the FDIC also served him by overnight courier at his residence, which, in any event, was proper service under the governing rules.[143]

4. Bonan's challenge to the FDIC Board's prohibition order and assessment of the $105,000 CMP fails because this Court "will set aside the Board's findings only if unsupported by substantial evidence on the record as a whole,"[144] and the record in this matter overwhelmingly supports the FDIC Board's Decision and Orders.[145]

---

[140] *Collins*, 594 U.S. at 259.

[141] *See Withrow v. Larkin*, 421 U.S. 35, 58 (1975); *Hess v. Board of Trustees of Southern Illinois Univ.*, 839 F.3d 668, 675 (7th Cir. 2016).

[142] *Kelly v. EPA*, 203 F.3d 519, 523 (7th Cir. 2000).

[143] *See, e.g., Sere v. Board of Trustees of the Univ. of Illinois*, 852 F.2d 285, 287 (7th Cir. 1988) (argument not raised in opening brief is waived).

[144] *Michael v. FDIC*, 687 F.3d 337, 348 (7th Cir. 2012).

[145] *See supra* at 10-22.

## ARGUMENT

### I. Under The Supreme Court's *SEC v. Jarkesy* Decision And The On-Point Decisions Of Three Circuits, Bonan Has No Right To A Jury Trial Here.

In *SEC v. Jarkesy*,[146] the Supreme Court held that a respondent in a Securities and Exchange Commission ("SEC") administrative enforcement proceeding had a right to a jury trial of securities-fraud claims that sought a CMP. Nevertheless, Bonan has no right to a jury trial here because the Supreme Court's reasoning in *Jarkesy* compels the conclusion that—unlike SEC securities-fraud claims—administrative enforcement claims under 12 U.S.C. § 1818 fall within the public-rights doctrine. What is more, all three federal courts of appeals that have decided the same question presented by this appeal have held there is no right to a jury trial of section 1818 administrative enforcement claims because they fall within the public-rights doctrine. Thus, the administrative enforcement claims at issue in this appeal properly were adjudicated by a non-Article III tribunal sitting without a jury.

#### A. *Jarkesy* Relied on Pre-existing Case Law and Did Not Overrule any Prior Decision.

In *Jarkesy*, the SEC initiated an administrative enforcement action against an investment adviser and his firm alleging securities fraud and seeking civil money penalties and other remedies.[147] The respondent challenged the entire proceeding, arguing that he was entitled to a jury trial because the SEC sought to recover a CMP. The Supreme Court concluded that the case presented the following narrow

[146] 603 U.S. 109 (2024).

[147] *Id.* at 118-19.

question: "[W]hether the Seventh Amendment entitles a defendant to a jury trial *when the SEC seeks civil penalties against him for securities fraud*."[148]

To decide that question, the Supreme Court said it was necessary to resolve two issues: (1) "whether th[e] action implicate[d] the Seventh Amendment[;]"[149] and (2) if it did, "whether the 'public rights' exception to Article III jurisdiction applie[d]."[150] And as the Court explained, its "analysis of th[at] question follow[ed] the approach set forth in [its earlier decisions] in *Granfinanciera*[*, S.A. v. Nordberg*, 492 U.S. 33 (1989),] and *Tull v. United States*,[481 U.S. 412 (1987)]."[151]

Addressing the first issue, the Supreme Court stated that "the Seventh Amendment extends to a particular statutory claim if the claim is 'legal in nature.'"[152] To determine whether it is, the Court instructed that "courts [must] consider the cause of action and the remedy it provides," and "the remedy [is] the 'more important' consideration."[153] The Supreme Court then ruled that, in *Jarkesy*, "the remedy [wa]s all but dispositive."[154] The Court explained: "What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'"[155] If the former is true, "money

---

[148] *Id.* at 120 (emphasis added).

[149] *Id.*

[150] *Id.*

[151] *Id.* (brackets added).

[152] *Id.* at 122.

[153] *Id.* at 122-23.

[154] *Id.* at 123.

[155] *Id.*

damages are the prototypical common law remedy."[156] Accordingly, "civil penalt[ies are] a type of remedy at common law that could only be enforced in courts of law."[157] The Supreme Court therefore ruled that—because the CMP in *Jarkesy* was "designed to punish and deter, not to compensate"—the securities-fraud claim there "implicate[d] the Seventh Amendment."[158] For the same reason, the FDIC does not contest that the Seventh Amendment is implicated here.

But as the Supreme Court made clear, that does *not* fully resolve the jury-trial issue. Rather, the Court held in *Jarkesy* that "[s]ince [the securities-fraud claim] d[id] implicate the Seventh Amendment, [the Court] next [had to] consider whether the 'public rights' exception to Article III jurisdiction applie[d]."[159] As the Supreme Court explained, "[t]his exception has been held to permit Congress to assign certain matters to agencies for adjudication even though such proceedings would not afford the right to a jury trial."[160] And as the Court explicitly acknowledged, under the public-rights doctrine "the Government may extract civil penalties in administrative tribunals in some contexts[.]"[161]

Next, the Supreme Court addressed how matters involving public rights are distinguished from those involving private rights. The Court began by stating that "[i]f a suit is in the nature of an action at common law"—that is, if the suit "is made

---

[156] *Id.*

[157] *Id.*

[158] *Id.* at 125.

[159] *Id.* at 120.

[160] *Id.*

[161] *Id.* at 131 n.2.

of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789'"—"then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory."[162] But "[a]t the same time," the Court continued, "[its] precedent has also recognized a class of cases concerning what [the Court] ha[s] called 'public rights.'"[163] The Supreme Court described public rights as "matters . . . [that] fall within . . . distinctive areas involving governmental prerogatives" like those previously identified by the Court.[164] And as the Court explained, "[s]uch matters 'historically could have been determined *exclusively* by [the executive and legislative] branches,' even when they were 'presented in such form that the judicial power [wa]s capable of acting on them.'"[165]

The *Jarkesy* Court also provided the following examples of "distinctive areas involving governmental prerogatives" where related matters have been held to fall within the public-rights doctrine: "collection of revenue," "power over immigration," "power over foreign commerce," power "to impose tariffs" to prevent "unfair methods of competition," "relations with Indian tribes," "administration of public lands," and "granting of [certain] public benefits."[166] Importantly, the Court made clear that this is *not* an exhaustive list. Rather, the Supreme Court stated that it "has not 'definitively explained' the distinction between public and private rights," and

---

[162] *Id.* at 127-28.

[163] *Id.* at 128.

[164] *Id.* at 120.

[165] *Id.* at 128 (emphasis and first and third brackets added, internal citation omitted).

[166] *Id.* at 129-30 (internal citations omitted, bracket added).

that it "d[id] not claim to do so [in *Jarkesy*]."[167] Instead, the Court admonished that the determination of whether the public-rights doctrine applies in any particular situation requires "close attention to the basis for each asserted application of the doctrine[.]"[168]

Before turning to the securities-fraud claim before it in *Jarkesy*, the Supreme Court stated that "the principles identified in [*Granfinanciera*] largely resolve[d] [*Jarkesy*]."[169] The issue in *Granfinanciera* was whether Congress properly had assigned adjudication of fraudulent-conveyance claims to non-Article III bankruptcy courts. The *Jarkesy* Court explained that, while focusing on two issues, *Granfinanciera* held that Congress did not properly assign those claims to bankruptcy courts.

*First*, the *Jarkesy* Court explained that fraudulent conveyance actions like those at issue in *Granfinanciera* "were often brought at law in late 18th-century England" and that "[t]he remedy the trustee sought [in *Granfinanciera*] was also one 'traditionally provided by law courts.'"[170] *Second*, the *Jarkesy* Court explained that *Granfinanciera* "also considered whether [the fraudulent conveyance] actions were 'closely intertwined' with the bankruptcy regime."[171] The *Granfinanciera* Court concluded they were not.[172] Moreover, in *Granfinanciera* the Court further concluded the fact that "Congress had already authorized jury trials for certain bank-

[167] *Id.* at 131.

[168] *Id.*

[169] *Id.* at 132.

[170] *Id.* at 133.

[171] *Id.*

[172] *Id.* at 134.

ruptcy matters[ ] demonstrat[ed] that jury trials were not generally 'incompatible' with the overall [bankruptcy] regime."[173]

After discussing these issues, the *Jarkesy* Court stated that *"Granfinanciera* effectively decide[d] th[e] [*Jarkesy*] case."[174] The Court emphasized that "[t]he object of th[e] SEC action w[as] to regulate transactions between private individuals interacting in a pre-existing market."[175] The Court also relied on the fact that Congress had authorized the SEC to choose to bring securities fraud claims seeking CMPs in either a federal court or an in-house proceeding. Indeed, in its majority opinion the Court mentioned this fact five times.[176] And in particular, the Supreme Court focused on the fact that SEC securities-fraud claims seeking CMPs historically had been brought in courts of law, and that it was not until 2010 that Congress authorized the SEC to instead bring such claims in administrative proceedings if it chose to do so.[177]

Based on its analysis, the *Jarkesy* Court held "[t]he [public-rights] exception d[id] not apply [t]here because the [SEC securities-fraud] action d[id] not fall within [a] distinctive area[ ] involving governmental prerogatives where . . . a matter may be resolved outside of an Article III court," and "[t]he Seventh Amendment therefore applie[d] and a jury [wa]s required."[178]

---

[173] *Id.* (quoting *Granfinanciera*, 492 U.S. at 61-62).

[174] *Id.*

[175] *Id.* at 135.

[176] *Id.* at 115, 117, 118, 119, 140.

[177] *Id.* at 118, 140.

[178] *Id.* at 120-21.

### B. This Case is Distinguishable from *Jarkesy* in Several Respects.

The securities-fraud claims and regulatory regime at issue in *Jarkesy* are very different from the section 1818 claims and regulatory regime at issue in this case. And because of these material differences, the public-rights doctrine *does* apply here and, therefore, Bonan has no right to a jury trial.

#### 1. The section 1818 enforcement claims at issue are matters that fall within "distinctive areas involving governmental prerogatives."

In *Jarkesy*, the Supreme Court held SEC securities fraud claims did not concern public rights because they did not fall within a "distinctive area[ ] involving governmental prerogatives where . . . a matter may be resolved outside of an Article III court, without a jury."[179] As noted *supra* at 28, the Court provided a non-exhaustive list of such distinctive areas that involve governmental prerogatives—including collection of revenue, imposition of tariffs, and granting of certain public benefits. Like these examples, protecting public funds in the Deposit Insurance Fund and the United States Treasury and granting the Government benefit of deposit insurance are such distinctive areas that involve governmental prerogatives.

##### a. Section 1818 enforcement actions help safeguard public funds.

The Supreme Court has recognized that "[b]anking is one of the longest regulated and most closely supervised of public callings."[180] This regulatory history reflects the central importance of a sound banking system to the nation's economy. Indeed, as one sister circuit has explained, "the FDIC is an instrumentality created

---

[179] *Id*. at 120.

[180] *Fahey v. Mallonee*, 332 U.S. 245, 250 (1947).

by the government for the public welfare . . . to provide for the sound, effective, and uninterrupted operation of the banking system."[181]

What is more, unlike securities regulation, banking regulation has a direct impact on public funds. Not only does "the FDIC rel[y] on premiums from insured banks to pay the cost of deposit insurance"[182]—which premiums become public funds when placed in the Deposit Insurance Fund[183]—but "the FDIC also relies on borrowing from the United States Treasury to meet its obligations."[184] Thus, the FDIC's bank-insurance obligations are "ultimately backed by the full faith and credit of the United States government[.]"[185] And because misconduct of banks and those through whom they act puts these public funds at risk, section 1818 enforcement actions are matters that fall within a distinctive area involving governmental prerogatives like those identified in *Jarkesy*. Simply stated, "[t]he purpose of enforcement of the [banking] regulation laws is to safeguard the [banking] industry, the depositors, *and the federal insurance fund*."[186] The SEC securities-fraud claims at issue in *Jarkesy* had no corresponding implications for public funds administered by the federal government or which may be drawn from the United States Treasury.

---

[181] *Spawn v. Western Bank—Westheimer*, 989 F.2d 830, 837 (5th Cir. 1993) (internal quotation marks omitted).

[182] *Id.* (citing 12 U.S.C. § 1817).

[183] *See* 12 U.S.C. § 1821(a)(4).

[184] *Spawn*, 989 F.2d at 837 (citing 12 U.S.C. § 1824).

[185] *Zucker v. Rodriguez*, 919 F.3d 649, 655 (1st Cir. 2019); *see also Slattery v. United States*, 635 F.3d 1298, 1318 (Fed. Cir. 2011) (en banc) ("Congressional pronouncements stress the full faith and credit of the United States in connection with the FDIC.").

[186] *Simpson v. OTS*, 29 F.3d 1418, 1423 (9th Cir. 1994) (emphasis added).

Moreover, it is beyond dispute that federally-insured-bank failures often have a significant effect on public funds. For example, earlier this year a small bank with only one office failed and the estimated cost to the Deposit Insurance Fund was $28.5 million.[187] In the second quarter of 2024, a single bank failed with an estimated cost to the Fund of $667 million.[188] And during the period from 2008-2013, almost 500 banks failed at a cost to the Fund of approximately $73 billion—causing the Fund to fall to a negative $20.9 billion.[189] Notably, "most of these were smaller banks."[190] Thus, the potential depletion of public funds that the section 1818 enforcement regime is designed to safeguard against is undeniably significant. Safeguarding these public funds is a distinctive area involving a governmental prerogative where a matter may be resolved outside of an Article III court.

**b. FDIC deposit insurance is a Government benefit.**

The FDIC's deposit-insurance scheme closely resembles regulatory programs as to which the Supreme Court has upheld Congress's power to condition the grant of rights or privileges on voluntary participation in a program where rights are adjudicated in a non-Article III tribunal without a jury. Indeed, the Supreme Court's de-

[187] *See* Press Release, Millenium Bank, Des Plaines, Ill. Assumes All Deposits of Pulaski Savings Bank, Chicago, Ill. (Jan. 17, 2025), available at https://www.fdic.gov/news/press-releases/2025/ millennium-bank-des-plaines-ill-assumes-all-deposits-pulaski-savings-bank (visited on 04/14/2025).

[188] *See* FDIC QUARTERLY, 2024 Volume 18 Number 3, at first unnumbered page, available at https:/www.fdic.gov/system/files//2024-09/fdic-v18n3-2q2024.pdf (visited on 04/14/2025).

[189] *See* Christopher Martin, Manju Puri, and Alexander Ufier, *Deposit Inflows and Outflows in Failing Banks: The Role of Deposit Insurance* 2 (July 2022), available at https:/www.fdic.gov/analysis/cfr/working-papers/2018/cfr-wp2018-02-update.pdf (visited on 04/14/2025).

[190] *Id.*

cision in *Thomas v. Union Carbide Agricultural Products Co.*[191] compels the conclusion that this is precisely what Congress did when it enacted section 1818.

*Union Carbide* involved a statutory scheme under which manufacturers seeking licenses required to sell pesticides had to submit research data to the Environmental Protection Agency.[192] To streamline procedures and avoid unnecessary duplication, manufacturers were permitted to rely on data previously submitted by other applicants, but they were required to compensate those other applicants for use of their data.[193] In the event of a disagreement between manufacturers on the amount to be paid (the claimed shortfall in *Union Carbide* was $50 million), the governing statute required the parties to submit their dispute to binding arbitration.[194] The question presented in *Union Carbide* was "whether Article III of the Constitution prohibit[ed] Congress from selecting binding arbitration with only limited judicial review as the mechanism for resolving disputes among participants in [the] pesticide [licensing] scheme."[195] The Supreme Court held it did not.[196]

As an initial matter, the *Union Carbide* Court ruled that the right to compensation under the statutory scheme before the Court in that case was a "public" right because "use of one [applicant's] data to support a follow-on [application] serve[d] a public purpose as an integral part of a program safeguarding the public

[191] 473 U.S. 568 (1985).

[192] *Id.* at 571.

[193] *Id.* at 571-72.

[194] *Id.* at 573-75, 579.

[195] *Id.* at 571.

[196] *Id.*

health."[197] Moreover, as the Supreme Court later explained, the "license to sell dangerous chemicals" in *Union Carbide* was a "valuable Government benefit."[198] For these reasons, the *Union Carbide* Court held that "Congress ha[d] the power, under Article I," to require that binding arbitration be used by the "voluntary participants in the program without providing an Article III adjudication."[199] And the Court further held that Congress "also ha[d] the power to condition issuance of registrations or licenses on compliance with agency procedures."[200]

*Union Carbide* is not distinguishable from this case in any material way. It cannot be disputed that FDIC deposit insurance is an integral part of a program safeguarding the public right to a safe and sound national banking system. Nor can it be disputed that FDIC deposit insurance is a valuable Government benefit for banks that receive it. And just like the regulated pesticide manufacturers in *Union Carbide*, FDIC-insured banks are "voluntary participants" in a complex regulatory scheme, not "unwilling defendant[s]."[201] Thus, Congress has the power under Article I to condition the receipt of FDIC deposit insurance on compliance with section 1818 procedures "without providing an Article III adjudication" beyond the right to appeal to a federal court of appeals from final orders issued under section 1818.[202]

---

[197] *Id.* at 589.

[198] *Horne v. Department of Agric.*, 576 U.S. 350, 366 (2015).

[199] *Union Carbide*, 473 U.S. at 589.

[200] *Id.*

[201] *Id.* at 589-91.

[202] *Id.* at 589. *See* 12 U.S.C. § 1818(i)(2)(A),(B),(C) & (H) (authorizing imposition of CMPs against "insured depository institution[s]" and providing for "agency hearing[s]"); *id.* at § 1818(h) (providing for judicial review of agency orders in the courts of appeals).

### 2. Section 1818 claims seeking CMPs historically have been adjudicated exclusively by administrative tribunals.

In *Jarkesy*, the Supreme Court described public rights as "matters [that] 'historically could have been determined *exclusively* by [the executive and legislative] branches,' even when they were 'presented in such form that the judicial power [wa]s capable of acting on them.'"[203] For this reason alone, SEC securities-fraud claims seeking CMPs do not fall within the public-rights doctrine. As the *Jarkesy* Court explained, historically "the SEC could obtain civil penalties *only in federal court*."[204] This changed in 2010, when Congress passed legislation that "ma[de] the SEC's authority in administrative penalty proceedings coextensive with its authority to seek penalties in [f]ederal court[,]" and "the SEC [could then] seek civil penalties in federal court, or it [could] impose them through its own in-house proceedings."[205] Nevertheless, the SEC still was not required to bring securities-fraud claims seeking a CMP *exclusively* in either legislative-branch or executive-branch proceedings.

But unlike the SEC, the FDIC has never been authorized to bring enforcement claims seeking CMPs in federal court. Nor has it ever done so. Rather, the FDIC is only authorized to bring such claims *exclusively* in administrative enforcement proceedings.[206] Thus, unlike SEC securities-fraud claims, FDIC enforcement claims fit

---

[203] *Jarkesy*, 603 U.S. at 128 (emphasis added).

[204] *Id.* at 118 (emphasis added).

[205] *Id.* (citing 15 U.S.C. §§ 77h-1(g), 78u-2(a), 80b-3(i)(1)).

[206] *See* 12 U.S.C. § 1818(h)(1) ("Any hearing provided for in this section . . . shall be conducted in accordance with the provisions of chapter 5 of title 5" and "the appropriate [f]ederal banking agency . . . shall render its decision . . . and . . . issue an order or orders").

squarely within *Jarkesy's* description of public rights. What is more, the requirement that a claim historically has been determined *exclusively* by the legislative or executive branches for it to fall within the public-rights doctrine is not a new requirement under *Jarkesy*. Rather, it is a long-standing cornerstone of the Supreme Court's public-rights jurisprudence.[207]

### 3. Section 1818 enforcement actions do *not* regulate transactions between private individuals interacting in a pre-existing market.

In *Jarkesy*, the Supreme Court emphasized that "[t]he object of th[e] SEC action [wa]s to regulate transactions between private individuals interacting in a pre-existing market."[208] Bonan seizes on this language and argues that the public-rights doctrine does not apply here because "the FDIC is regulating transactions made between private parties (Grand Rivers and 618 Holdings)."[209] Bonan is wrong.

In stark contrast with the securities-fraud claims at issue in *Jarkesy*, the section 1818 claims at issue here do *not* involve a pre-existing market. Instead, they involve a bank-deposit-insurance program created and administered by the Federal

---

[207] *See, e.g., Stern v. Marshall*, 564 U.S. 462, 493 (2011) (claim within public-rights doctrine is "one that 'historically could have been determined *exclusively* by' [the legislative or executive] branches") (emphasis added); *Granfinanciera,* 492 U.S. at 49 (a jury trial is required unless Congress has "withdrawn jurisdiction over that action by courts of law and assigned it *exclusively* to non-Article III tribunals sitting without juries") (emphasis added); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 68 (1982) ("The [public-rights] doctrine extends . . . only to matters that historically could have been determined *exclusively* by [the legislative or executive] departments[.]") (emphasis added); *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450 (1977) (Congress may "create[ ] new statutory obligations, provide[ ] for civil penalties for their violation, and commit[ ] *exclusively* to an administrative agency the function of deciding whether a violation has in fact occurred.") (emphasis added).

[208] *Jarkesy*, 603 U.S. at 135.

[209] Petitioner's Br. 35.

Government. Indeed, as the Fifth Circuit has noted, "[t]he Federal Deposit Insurance Act . . . represented a 'pioneering effort' to insure against losses in a market 'where commercial insurers had feared to tread.'"[210] Nor do section 1818 enforcement actions like this one regulate transactions between private individuals. To the contrary, they regulate federally insured banks and the institution-affiliated parties through whom those banks act to deter misconduct that puts the financial safety and soundness of those banks—and, therefore, public funds in the Deposit Insurance Fund and the United States Treasury—at risk.

Consequently, the Supreme Court's emphasis on the private transactions and pre-existing market at which the securities-fraud claims were directed in *Jarkesy* further supports the conclusion that the public-rights doctrine *does* apply here.

**4. Section 1818 enforcement actions are "closely intertwined" with the federal bank-regulatory regime.**

The Supreme Court instructed in *Jarkesy* that—when determining if the public-rights doctrine applies—courts must also "consider[ ] whether the[ ] [enforcement] actions [at issue] [are] 'closely intertwined' with the [relevant regulatory] regime."[211] And the Court emphasized that, when applying this factor in *Granfinanciera*, it concluded the fact "that Congress had already authorized jury trials for certain bankruptcy matters demonstrat[ed] that jury trials were not generally 'incompatible' with the overall [bankruptcy] regime."[212] Applying this part of *Gran-*

[210] *Spawn*, 989 F.2d at 837.

[211] *Jarkesy*, 603 U.S. at 133.

[212] *Id.* at 134.

*financiera* in *Jarkesy*, the Supreme Court similarly concluded it was significant that "Congress had authorized the SEC to bring [securities-fraud] actions in Article III courts and still authorizes the SEC to do so today."[213]

But unlike SEC securities-fraud claims, Congress has authorized section 1818 enforcement claims seeking CMPs to be brought *exclusively* in administrative proceedings. And under the reasoning of both *Jarkesy* and *Granfinanciera*, this demonstrates that jury trials *are* generally incompatible with the overall federal bank-regulatory regime. In addition, courts have recognized that "[t]he phrase 'unsafe or unsound banking practice' is widely used in the regulatory statutes and in case law, and [that] *one of the purposes of the banking acts is clearly to commit the progressive definition and eradication of such practices to the expertise of the appropriate regulatory agencies*."[214] For both of these reasons—unlike SEC administrative securities-fraud actions—section 1818 administrative enforcement actions are "closely intertwined" with the relevant regulatory regime.

#### 5. Prohibiting the FDIC and other federal banking agencies from bringing section 1818 claims seeking CMPs in administrative proceedings would prevent them from bringing such claims at all.

The Supreme Court also found it significant in *Jarkesy* that if the SEC could no longer bring administrative actions seeking to impose CMPs for securities fraud it would still be able to bring such claims in federal court. As the Court explained, "Congress ha[s] authorized the SEC to bring such actions in Article III courts and

---

[213] *Id.* at 140.

[214] *Groos Nat'l Bank v. Comptroller of the Currency*, 573 F.2d 889, 897 (5th Cir. 1978) (emphasis added).

still authorizes the SEC to do so today."[215] And in a concurring opinion, two of the Justices expanded on this point: "[T]he Court hardly leaves the SEC without ample powers and recourse. The agency is free to pursue all of its charges against Mr. Jarkesy . . . [i]n a court, before a judge, and with a jury."[216]

But that is not true here. To the contrary, prohibiting the FDIC and the other federal banking agencies from bringing enforcement claims seeking CMPs in administrative proceedings would foreclose them from bringing such claims at all. And as the Supreme Court acknowledged in *Jarkesy*, CMPs are one of the "most potent enforcement tools."[217]

Consequently—unlike the securities-fraud claims at issue in *Jarkesy*—requiring jury trials for section 1818 claims seeking CMPs "would 'go far to dismantle the statutory scheme.'"[218] This is yet another factor that weighs heavily in favor of a determination that the public-rights doctrine *does* apply here.[219]

### C. All Three Circuit Courts that have Decided the Issue have Held that Section 1818 Claims fall within the Public-Rights Doctrine.

In *Akin v. OTS*,[220] the Office of Thrift Supervision ("OTS") initiated a section 1818 administrative proceeding against Akin, the sole shareholder and former officer of a bank that failed. Three years before the bank failed, Akin had entered

---

[215] *Jarkesy*, 603 U.S. at 140.

[216] *Id.* at 167 (Justice GORSUCH, with whom Justice THOMAS joined, concurring).

[217] *Id.* at 118.

[218] *Granfinanciera*, 492 U.S. at 61 (quoting *Atlas Roofing*, 430 U.S. at 454).

[219] *See Jarkesy v. SEC*, 34 F.4th 446, 455-56 (5th Cir. 2022) (statutory scheme not "dismantled" because it allowed both in-house and federal-court actions), *aff'd*, 603 U.S. 109 (2024).

[220] 950 F.2d 1180 (5th Cir. 1992).

into an agreement with OTS's predecessor agency requiring that he maintain the bank's legally mandated net worth by making capital infusions as needed.[221] The bank subsequently developed a net-worth deficiency in excess of $19 million.[222] When Akin refused to pay that amount into the bank, OTS initiated the administrative proceeding to enforce the agreement. While that proceeding was pending, the bank failed. At the end of the proceeding, OTS ordered Akin to pay more than $19 million into the bank's receivership.[223]

On direct appeal to the Fifth Circuit, Akin "claim[ed] that [the] action [was] a collection action on a breach of contract, entitling him to a jury trial."[224] But the court rejected that claim and held that, because "there [wa]s a proper administrative forum for adjudicating public rights, there [wa]s no right to a jury trial."[225] In support of that holding, the Fifth Circuit relied solely on *Granfinanciera*.[226]

As demonstrated *supra* at 25-30, *Jarkesy* did not plow any new ground or overrule any case. Rather, the Supreme Court simply applied pre-existing case law—primarily, *Granfinanciera*—to a different statute, different claims, and different facts than those involved in *Akin* (or here). Thus, *Akin* is still controlling precedent in the Fifth Circuit because it was not "unequivocally overruled" by *Jarkesy*.[227] Nor

---

[221] *Id* at 1182.

[222] *Id.*

[223] *Id.*

[224] *Id.* at 1186.

[225] *Id.*

[226] *Id.* (citing *Granfinanciera*, 492 U.S. at 42, 54-55).

[227] *See Texas v. United States*, 126 F.4th 392, 407 (5th Cir. 2025).

did *Jarkesy* implicitly overrule *Akin*, because it did not "fundamentally change[ ] the focus of the relevant analysis[.]"[228] To the contrary, as just discussed, both *Jarkesy* and *Akin* are squarely grounded on the Supreme Court's analysis of the public-rights doctrine in its earlier decision in *Granfinanciera*.

We anticipate that Bonan may attempt to rely in his reply brief on the Fifth Circuit's recent decision in *AT&T, Inc. v. FCC*,[229] where the court held that a Federal Communications Commission ("FCC") administrative enforcement proceeding did not fall within the public rights doctrine.[230] But the *AT&T* decision does not dislodge *Akin* as controlling precedent in the Fifth Circuit. Rather, like *Jarkesy*, *AT&T* analyzes the same legal principles and case law the Fifth Circuit relied on while deciding *Akin* and applies that analysis and reasoning to a different statute, different claims, and different facts than those involved in *Akin* (or here), resulting in a different outcome.

Moreover, the Supreme Court acknowledged in *Jarkesy* that "the Government may extract civil penalties in administrative tribunals in some contexts" while instructing that determining whether the public-rights doctrine applies requires "close attention to the basis for each asserted application of the doctrine."[231] The basis asserted by the FDIC here differs significantly from that asserted by the FCC in *AT&T*. Among the material ways in which *AT&T* is distinguishable from this

---

[228] *Id.*

[229] --- F.4th ---, 2025 WL 1135280 (5th Cir. Apr. 17, 2025).

[230] *Id.*, 2025 WL 1135280, at *6-*9

[231] *Jarkesy*, 603 U.S. at 131 and n.2.

case are: (1) the FCC did not identify any "distinctive area[ ] involving governmental prerogatives"[232]—like safeguarding public funds in the Deposit Insurance Fund and U.S. Treasury or granting the public benefit of FDIC deposit insurance—but instead relied on the "broad" contention that "common carriers like AT&T are 'affected with a public interest;'"[233] and (2) the FCC's statute explicitly provides respondents the opportunity to obtain a *de novo* jury trial in district court of the factual basis for the FCC's action,[234] while section 1818 provides exclusively for adjudication of claims in administrative proceedings with direct appeals to federal courts of appeals.[235] And critically, the federal deposit insurance and corresponding need to safeguard public funds that are at issue here are closely analogous to the revenue collection, tariffs, customs fine enforcement, and public benefits that both *Jarkesy* and *AT&T* cited as examples of "distinctive areas involving governmental prerogatives" that fall within the public rights doctrine.[236]

In *Cavallari v. OCC*,[237] the respondent in a section 1818 administrative action challenged an Office of the Comptroller of the Currency ("OCC") order that included a CMP imposed under section 1818(i), and he alleged that "the agency proceedings deprived him of his constitutional right to a jury trial."[238] Relying on *Gran-*

---

[232] *Id.* at 120.

[233] *AT&T*, 2025 WL 1135280, at *7.

[234] *Id.* at *2.

[235] *See* 12 U.S.C. §§ 1818(h)(1) and (2).

[236] *See Jarkesy*, 603 U.S. at 128-130; *AT&T*, 2025 WL 1135280, at *6.

[237] 57 F.3d 137 (2d Cir. 1995).

[238] *Id.* at 139.

*financiera* and *Akin*, the Second Circuit held "[t]he OCC charges clearly implicate[d] public rights" and, "[t]herefore, no jury trial was required."[239] *Cavallari* is still controlling precedent in the Second Circuit because its "rationale [was not] overruled, implicitly or expressly, by the Supreme Court" in *Jarkesy*.[240]

Finally, in *Simpson v. OTS*,[241] the respondent in a section 1818 administrative action argued that a claim for restitution was "really a claim for damages and [wa]s therefore legal in nature deserving of a jury trial."[242] The Ninth Circuit read *Akin* as holding "that the right to a jury trial in an OTS proceeding is not violated because the OTS's action is an enforcement of public rights,"[243] and it therefore held "the Seventh Amendment [wa]s inapplicable to th[at] OTS proceeding which implicate[d] public rights."[244] *Simpson* is still controlling precedent in the Ninth Circuit because it is not "clearly irreconcilable" with *Jarkesy*.[245]

"It would take a strong reason for [this Court] to create a circuit split[.]"[246] Because this case presents no such reason, this Court should "decline to do so here."[247] Instead, we respectfully submit that this Court should follow the decisions of the Second, Fifth, and Ninth Circuits discussed above that address adjudication

---

[239] *Id.* at 145.

[240] *FDIC v. First Horizon Asset Securities, Inc.*, 821 F.3d 372, 375 (2d Cir. 2016).

[241] 29 F.3d 1418 (9th Cir. 1994).

[242] *Id.* at 1423.

[243] *Id.* (citing *Akin*, 950 F.2d at 1186).

[244] *Id.* at 1424.

[245] *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

[246] *Nabozny v. Optio Solutions LLC*, 84 F.4th 731, 735 (7th Cir. 2023).

[247] *Id.*

under section 1818—all of which are consistent with *Jarkesy*—and hold there is no right to a jury trial of the section 1818 claims at issue here because they fall within the public-rights doctrine.

## II. Bonan Is Not Entitled To Relief On His Improper-Removal-Restriction Claims Because He Does Not Allege Any Compensable Harm.

In *Collins v. Yellen*,[248] the Supreme Court clarified that an unconstitutional removal restriction does not affect a duly-appointed officer's ability to execute the duties of the office.[249] Instead—unlike an unlawful appointment where an officer wields "power that the actor did not lawfully possess"[250]—an improper removal restriction does not affect a duly-appointed officer's authority, but only implicates the President's ability to oversee the officer's action.[251] Consequently, if an officer was properly appointed by the President or a Department Head, "there is no basis for concluding" that the officer "lacked the authority to carry out the functions of the office."[252] The Supreme Court therefore held in *Collins* that a litigant who challenges a removal restriction must show that the restriction "inflict[ed] compensable harm."[253] Put another way, the litigant must show that the removal restriction "affected the complained-of decision."[254]

---

[248] 594 U.S. 220 (2021).

[249] *Id.* at 257-58.

[250] *Id.* at 258.

[251] *Id.* at 258-59.

[252] *Id.* at 258.

[253] *Id.* at 259.

[254] *Id.* at 274 (Justice KAGAN, with whom Justice BREYER and Justice SOTOMAYOR joined, concurring in part and concurring in the judgment).

The *Collins* Court also explained that a litigant may make the required showing of compensable harm by, for example, pointing to a "public statement" by the President or a Department Head "expressing displeasure with actions taken by" a Director or ALJ and "assert[ing] that he would remove the [Director or ALJ] if the statute did not stand in the way."[255] Bonan does not contend that any such statement was made here. Nor does he contend that the removal restrictions he challenges otherwise "affected the complained-of decision." Thus, he is not entitled to any relief on his removal-restriction claims.

In the wake of *Collins*, all eight federal circuits that have decided the issue have held that litigants who challenged a removal restriction had to show that the restriction itself prejudiced their cases in order to be entitled to any relief.[256] In this case, Bonan does not contend that the removal restrictions he challenges have themselves prejudiced his case in any way. Nor does he contend that there is any reason—let alone a "strong reason"—why this Court should create a circuit split on this issue. Accordingly, this Court should follow the uniform decisions of its eight sister circuits and hold that Bonan is not entitled to any relief on his removal-restriction claims.

---

[255] *Id.* at 260.

[256] *See CFPB v. Law Offices of Crystal Maroney, P.C.*, 63 F.4th 174, 180 (2d Cir. 2023); *CFPB v. National Collegiate Master Student Loan Trust*, 96 F.4th 599, 607, 614-15 (3d Cir. 2024); *K & R Contractors v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023); *Community Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 632-33 (5th Cir. 2022), *rev'd on other grounds*, 601 U.S. 416 (2024); *Calcutt v. FDIC*, 37 F.4th 293, 317-20 (6th Cir. 2022), *rev'd on other grounds per curiam*, 598 U.S. 623 (2023); *Kaufmann v. Kijakazi*, 32 F.4th 843, 849-50 (9th Cir. 2022); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 765 (10th Cir. 2024); *Rodriguez v. SSA*, 118 F.4th 1302, 1315 (11th Cir. 2024).

## III. The FDIC Proceedings Did Not Violate Bonan's Right To Due Process.

Bonan contends his due-process rights were violated for three reasons: (1) the FDIC both investigated and adjudicated this enforcement action; (2) he was prevented from taking depositions; and (3) he was not properly served with the Notice.[257] Bonan is thrice wrong.

### A. Administrative Agencies may Investigate and Adjudicate.

In *Withrow v. Larkin*,[258] the Supreme Court held that "the combination of investigative and adjudicative functions [in a single body] does not, without more, constitute a due process violation."[259] What is more, Bonan concedes that the *Withrow* Court was "unpersuaded that due process was threatened by the melding of prosecutor and judge in administrative actions[.]"[260] Accordingly, the controlling decision in *Withrow* should fully resolve this issue against Bonan.

Nevertheless, Bonan attempts to avoid *Withrow* by noting that it is "a nearly fifty-year-old decision" and arguing that "more recent jurisprudence suggests a Fifth Amendment violation [occurs] when . . . an action . . . is investigated and adjudicated by the same administrative body."[261] This argument is doubly flawed.

*First*, "[i]f [*Withrow*] is to be overruled, only the Supreme Court itself can overrule it."[262] And this would be true even if there were a reason for this Court to

---

[257] Petitioner's Br. 40-45

[258] 421 U.S. 35 (1975).

[259] *Id.* at 58.

[260] Petitioner's Br. 40.

[261] *Id.* at 40-41.

[262] *Foreman v. Wadsworth*, 844 F.3d 620, 624 (7th Cir. 2016) (citing *Thurston Motor Lines,*

"doubt that [*Withrow*] is still good law."[263] Accordingly, because the Supreme Court has not overruled *Withrow,* it is controlling precedent that must be applied here.

*Second*, the more recent case Bonan relies on to displace *Withrow*—*Williams v. Pennsylvania*[264]—is distinguishable. In *Williams*, the Supreme Court found a due-process violation where a judge had been a prosecutor in the defendant's case and sought the death penalty.[265] The Court determined that "an unconstitutional potential for bias exists when *the same person* serves as both accuser and adjudicator[.]"[266] But here, Bonan concedes that "the members of the FDIC adjudicating this action are *not* the same people investigating and prosecuting [him.]"[267] What is more, the *Williams* Court relied heavily on *In re Murchison*,[268] where an individual acting in the roles of both a grand jury and a judge was held to violate due process.[269] But as the Supreme Court had clarified in *Withrow*, "*Murchison* has not been understood to stand for the broad rule that the members of an administrative agency may not investigate facts, institute proceedings, and then make the necessary adjudications."[270] Thus, *Withrow*—not *Williams*—is controlling authority here.

---

*Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983), and *Hutto v. Davis*, 454 U.S. 370, 375 (1982)).

[263] *Thurston Motor Lines*, 460 U.S. at 535.

[264] 579 U.S. 1 (2016); *see* Petitioner's Br. 41.

[265] *Williams*, 579 U.S. at 8-10.

[266] *Id.* at 8 (emphasis added).

[267] Petitioner's Br. 41 (emphasis added).

[268] 349 U.S. 133 (1955).

[269] *Id.* at 138.

[270] *Withrow*, 421 U.S. at 54.

Indeed, this Court cited *Withrow* in a post-*Williams* decision as support for the proposition that "the combination of investigative and adjudicative functions into a single administrator does not, in itself, demonstrate [a due-process violation]."[271] Yet "investigat[ion] and adjudicat[ion] by the same administrative body" is all that Bonan contends happened here.[272] Thus, there is no due-process violation.

### B. There is No Right to Take Pretrial Depositions in Administrative Proceedings.

Bonan argues that he was denied due process because he was not permitted to take pretrial depositions. But once again, he ignores binding precedent. In *Kelly v. EPA*,[273] this Court reaffirmed that "there is no right to pretrial discovery in administrative proceedings."[274] Nevertheless, Bonan contends his "right to due process includes, 'as a minimum, a right to examine the witnesses against him[,]'"[275] and he asserts that his inability to depose witnesses denied him that right.[276] Not true.

At the hearing in this action, Bonan cross-examined witnesses and presented and examined his own witnesses.[277] And as he concedes, he was also afforded the opportunity to—and did—depose the unavailable witnesses before trial.[278] Again, there is no due-process violation.

---

[271] *Hess v. Board of Trustees of Southern Illinois Univ.*, 839 F.3d 668, 675 (7th Cir. 2016).

[272] Petitioner's Br. 41.

[273] 203 F.3d 519 (7th Cir. 2000).

[274] *Id.* at 523 (citing *Silverman v. CFTC*, 549 F.2d 28 (7th Cir. 1977)).

[275] Petitioner's Br. 43 (quoting *In re Oliver*, 333 U.S. 257, 273 (1948)).

[276] *Id.*

[277] 30(a)App. 64 (citing Hearing Transcript).

[278] Petitioner's Br. 42; *see also* 30(a)App. 63 (same).

### C. Bonan has Waived the Argument that He was Not Properly Served With the Notice and, In Any Event, He was Properly Served.

Bonan argues that he was not properly served with the Notice.[279] A threshold issue that must be addressed is whether Bonan waived this argument.[280] The record establishes that he did.

Service upon a person that has not yet appeared in an FDIC administrative proceeding is governed by 12 C.F.R. § 308.11(c)(2), which provides that service shall be made by: (i) personal service; (ii) delivery to the person's residence or workplace; (iii) delivery to a registered agent; (iv) registered or certified mail; or (v) "any other method reasonably calculated to give actual notice."[281]

Bonan complains that the FDIC attempted to serve him with the Notice by e-mailing it to his attorney, and that his attorney properly refused to accept that service.[282] But he neglects to mention that the FDIC also served him via overnight courier at his residence.[283] Moreover, Bonan also neglects to mention that the FDIC Board determined this latter method of service was "reasonably calculated to give [him] actual notice," and that it was therefore "sufficient to meet service of process requirements" under section 308.11(c)(2)(v).[284] Thus, Bonan did not argue

---

[279] Petitioner's Br. 43-45.

[280] *See Bonnstetter v. City of Chicago*, 811 F.3d 969, 973 (7th Cir. 2016) (waiver issue must be addressed "[p]reliminarily"); *Sere v. Board of Trustees of the Univ. of Illinois*, 852 F.2d 285, 287 (7th Cir. 1988) ("The first issue we must address is whether [the appellant] waived [the issue] by failing to raise it in his opening brief.").

[281] 12 C.F.R. § 308.11(c)(2)(v).

[282] Petitioner's Br. 43; *see also* 30(a)App. 65.

[283] *Id.*

[284] *Id.*

in his opening brief that the *service via overnight courier* was deficient. He has therefore waived that argument.

This Court "consistently and evenhandedly ha[s] applied the waiver doctrine when appellants have failed to raise an issue in their opening brief."[285] Consequently, because Bonan "failed to address any argument in [his] opening brief [with respect to the propriety of service via overnight courier], [he] ha[s] waived any such arguments[.]"[286] And even if Bonan had not waived the argument, there are no circumstances here that would warrant a finding that service by overnight courier was not reasonably calculated to give Bonan actual notice of the FDIC administrative enforcement proceeding and the charges against him. It necessarily follows that such service satisfied the requirements of section 308.11(c)(2).

It is undisputed that Bonan was properly served with the Notice via overnight courier, that he had actual notice of the proceedings, that he timely responded to the charges, and that he otherwise fully participated in the proceedings. Once again, there is no due-process violation.

## IV. The Record Overwhelming Supports The FDIC Board's Issuance Of A Prohibition Order And Assessment Of A $105,000 CMP.

Bonan challenges the FDIC Board's prohibition order and CMP almost exclusively on evidentiary grounds. As for the prohibition order, Bonan argues that "[t]he facts in the record simply do not support the FDIC Board's conclusion that [he] engaged in an unsafe or unsound practice in connection with the [$1.25 million

[285] *Sere*, 852 F.2d at 287.

[286] *Bonnstetter*, 811 F.3d at 973.

loan,]"[287] and that "no . . . breach of fiduciary duty occurred."[288] And as for the CMP, Bonan argues that, due to "errors pertaining to the FDIC Board's findings on Rig 23 and [the $1.25 million loan], the FDIC Board abused its discretion in assessing a CMP against [Bonan]."[289] But as demonstrated *supra* at 10-22, the record facts in this case speak for themselves. And as we demonstrate *infra*, under the governing legal standards those record facts overwhelmingly support the FDIC Board's issuance of the prohibition order and its assessment of the CMP.

**A. The FDIC Board Properly Issued the Prohibition Order.**

In *Calcutt v. FDIC*,[290] the Supreme Court explained that "the question whether to sanction [the respondent in an FDIC administrative enforcement action]—as well as the severity and type of any sanction that could be imposed—is a discretionary judgment. And that judgment is highly fact specific and contextual, given the number of factors relevant to [the respondent's] ultimate culpability."[291]

What is more, as this Court explained in *Michael v. FDIC*,[292] because the APA governs its review in appeals from FDIC Board orders, it "will set aside the Board's findings only if unsupported by substantial evidence on the record as a whole."[293] Under this standard of review, "[s]ubstantial evidence is such relevant evidence

[287] Petitioner's Br. 49.

[288] *Id.* at 51.

[289] *Id.* at 60.

[290] 598 U.S. 623 (2023).

[291] *Id.* at 630.

[292] 687 F.3d 337 (7th Cir. 2012).

[293] *Id.* at 348.

[as] a reasonable person would deem adequate to support the ultimate conclusion."[294] In addition, "[c]redibility determinations should not be overturned absent extraordinary circumstances, such as a clear showing of bias by the ALJ, utter disregard for uncontroverted sworn testimony, or acceptance of testimony which on its face is incredible."[295] This Court also acknowledged that "[t]he Board is entitled to discretion in imposing sanctions against violators[,]" and that "[t]he relation of remedy to statutory policy is peculiarly a matter for the special competence of [the FDIC]."[296]

Applying these governing legal principles here, it is readily apparent that the FDIC Board did not abuse its discretion in issuing its Decision and Orders.

1. Relying solely on a dissenting opinion from a Sixth Circuit case, Bonan argues that his actions involving the $1.25 million loan cannot constitute an "unsafe or unsound practice" because they involve only a "singular transaction."[297] But Bonan inexplicably ignores this Court's controlling decision in *Michael v. FDIC*, where this Court held that the FDIC Board needed to prove only "(1) an improper act, (2) that had an impermissible effect, and (3) was accompanied by a culpable state of mind[,]" and that the petitioner's "complicity in any one of the[ ] transactions [at issue there] . . . was sufficient to support removal."[298]

[294] *Id.*

[295] *Id.* (internal quotation marks omitted).

[296] *Id.*

[297] Petitioner's Br. 46, 49.

[298] *Michael*, 687 F.3d at 348-349.

2. Bonan asserts that the FDIC Board's finding of misconduct regarding the $1.25 million loan "had nothing to do with him."[299] But as the facts found by the Board and set out in the fact section of this brief establish, *supra* at 12-18, Bonan orchestrated the entire transaction involving the purchase and leaseback of the Carmi Warehouse. As the Board found: "The record clearly establishes that [Bonan] . . . was the 'architect' of the [$1.25 million] loan. He initiated the purchase of the Carmi Warehouse by Harbison and Tate, he dictated the terms of the purchase and the related leaseback, and he facilitated the financing through Grand Rivers."[300] And "while [Bonan] did abstain from voting for the loan, the record establishes that he influenced the vote to approve it."[301] Indeed, CFO Gaskins—whose vote was necessary for the loan to be approved—testified that, although he did not believe Harbison and Tate had the ability to repay the loan, he voted to approve it anyway because he was told to do so by Bonan and he believed that, if he hadn't voted to approve, Bonan would have removed him from his position.[302]

3. Bonan argues that the loan did not create an "abnormal risk of loss" for Grand Rivers because it was performing properly and loan payments were being made until the loan was put on non-accrual status after an examination of the Bank.[303] But Bonan ignores the undisputed fact that the payments were being

---

[299] Petitioner's Br. 47, *see also id.* at 47-48.

[300] 30(a)App. 37 (citations to record omitted).

[301] *Id.*

[302] 30(a)App. 10-11; 30(b)App. 43. The ALJ made an explicit finding that this testimony was credible. *Id.*

[303] Petitioner's Br. 48-49.

made from the lease reserve account, which "mask[ed] the loan's true repayment ability."[304] Indeed, because the lease reserve account was funded by proceeds from the $1.25 million loan,[305] the Bank was effectively making the loan payments to itself.

4. Bonan argues that the Board's finding that he put PNB's interests over Grand Rivers' interests is not accurate because both banks had their original mortgages extinguished by the sale of the Carmi Warehouse.[306] But he ignores the undisputed facts that, while PNB recovered $358,000 of the debt owed to it by Evergreen, Grand Rivers effectively refinanced its prior $638,000 mortgage and also took on additional debt—moving the mortgage debt previously held by PNB to Grand Rivers and also adding another $250,000 for operating expenses and the lease-reserve escrow.[307]

5. Bonan argues that Grand Rivers suffered no loss because "the [B]ank could have sought compensation from Harbison and Tate or sold the property."[308] But the record establishes that neither option was available. Harbison and Tate's combined annual adjusted gross income was less than $90,000 a year, and they had no significant assets.[309] Moreover, the best offer Grand Rivers received for the Carmi Warehouse was more than $150,000 less than the then-current amount due on the

---

[304] 30(a)App. 14.

[305] 30(b)App. 45.

[306] Petitioner's Br. 51.

[307] 30(a)App. 14, 35; 30(b)App. 45.

[308] Petitioner's Br. 49.

[309] 30(a)App. 12-13.

$1.25 million loan, and to take that offer the Bank would have had to "take further charge-downs which it couldn't afford at the time."[310]

**B. The FDIC Board Properly Assessed the $105,000 CMP.**

The FDIC Board concluded the same evidence that supported imposition of a prohibition order also supported assessment of a CMP,[311] and Bonan objects to the CMP for the same reasons he objects to the prohibition order.[312] Accordingly, for the reasons discussed in the previous section of this brief, *supra* at 52-56, the FDIC Board did not abuse its discretion in assessing the CMP against Bonan.

Bonan also objects to the FDIC Board's conclusion that Bonan's involvement in the erroneous release of the Rig 23 PMSI also warranted a CMP.[313] But the record establishes that the FDIC Board did not abuse its discretion in determining that Bonan breached his fiduciary duty to the Bank and engaged in unsafe and unsound banking practices that contributed to the release of the Rig 23 PMSI.[314] While Bonan provides a minute-by-minute account of the actions of various individuals leading up to the erroneous release of the Rig 23 PMSI,[315] these details do not obscure his leading role in what Bonan himself describes as a "comedy of errors."[316] As the Board concluded: "[Bonan] was in charge of the Evergreen loan re-

[310] 30(b)App. 53.

[311] 30(a)App. 42.

[312] Petitioner's Br. 54.

[313] *Id.* at 54-60.

[314] 30(a)App. 51.

[315] Petitioner's Br. 6-12.

[316] *Id.* at 55.

lationship. He was a party to many of the miscommunications involving the erroneous release of that Rig and failed to clear up the evident confusion about the Bank's interest in the rig being sold. And he exercised his influence to pressure Gaskins and Winters to secure the release."[317] What is more, "[t]he ALJ found that [Bonan's] testimony with respect to the issues involving the release of Rig 23 was not credible. In particular, the ALJ found that [Bonan] was not credible with respect to whether he believed Grand Rivers held a security interest in Rig 24 at all, and when he believed it."[318]

* * *

Like the petitioners in *Michael v. FDIC*, "[w]hat seems to be lost on [Bonan] in this appeal is that [this Court] affords great deference to the trier of fact when making credibility determinations and weighing conflicting evidence."[319] And "[b]ecause the large, voluminous record in this case, thoroughly analyzed by the ALJ and the Board, contains substantial evidence to support the Board's decision, [this Court should] affirm."[320]

## CONCLUSION

The Petition should be denied in its entirety.

---

[317] 30(a)App. 43.

[318] *Id.* at 24 (internal record citation omitted); *see also* 30(b)App. 12, 73-77.

[319] *Michael*, 687 F.3d at 342.

[320] *Id.*

Dated: April 24, 2025

Respectfully submitted,

J. Scott Watson
Senior Counsel

s/Joseph Brooks
Joseph Brooks
Counsel
FEDERAL DEPOSIT INSURANCE CORPORATION
3501 Fairfax Drive, Room D-7010
Arlington, VA 22226
Tel: (703) 562-2054
Fax: (703) 562-2469
E-mail: jobrooks@fdic.gov

*Counsel for Respondent Federal Deposit Insurance Corporation*

## RULE 32(g) CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because it contains 13,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Undersigned counsel further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and Seventh Circuit Rule 32(b) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced 12-point (11-point for footnotes) Century Schoolbook typeface.

s/ Joseph Brooks
Joseph Brooks
*Counsel for Respondent Federal Deposit Insurance Corporation*

Dated: April 24, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Answering Brief of Respondent Federal Deposit Insurance Corporation has been filed by electronic case filing and served on counsel of record through the Court's Notice of Docket Activity on this 24th day of April, 2025.

s/ Joseph Brooks
Joseph Brooks